UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

Russell H.,[1]                                )    Civil Action No. 5:22-01616-KDW
                                              )
                            Plaintiff,        )
                                              )
            vs.                               )                ORDER
                                              )
Kilolo Kijakazi, Acting Commissioner          )
of Social Security,                           )
                                              )
                            Defendant.        )

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

his claim for Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the

Act"). Having carefully considered the parties' submissions and the applicable law, the court

reverses and remands the Commissioner's decision for further action for the reasons discussed

herein.

I.      Relevant Background

        A.      Procedural History

        Plaintiff applied for SSI on May 28, 2020, alleging disability beginning January 1, 2005

due to bipolar disorder, social anxiety, obsessive compulsive disorder ("OCD"), and a learning

disorder. Tr. 10, 195–203, 221. Plaintiff's application was denied initially and on reconsideration.

Tr. 99, 116. On August 25, 2021, at Plaintiff's request, an Administrative Law Judge ("ALJ")

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of
the United States has recommended that, due to significant privacy concerns in social security
cases, federal courts should refer to claimants only by their first names and last initials.

conducted a hearing, at which the ALJ heard testimony from Plaintiff, Plaintiff's mother, and an impartial vocational expert ("VE"). Tr. 28–62. The ALJ issued a decision denying Plaintiff's claims on September 24, 2021. Tr. 10–19. On March 21, 2022, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision for purposes of judicial review. Tr. 1–3. Plaintiff filed this action on May 23, 2022. ECF No. 1.

B.    Plaintiff's Background

Plaintiff was born in 1969, and was 35 years old as of his alleged onset date and 51 years old on his application date. Tr. 217. In his June 3, 2020 Disability Report-Adult form, Plaintiff indicated he completed the tenth grade,[2] did not attend special education classes, and had not completed any type of specialized job training, trade or vocational School. Tr. 222. Plaintiff indicated he had not worked within the 15 years prior to his application. *Id.* Plaintiff listed his medical conditions that limited his ability to work as bipolar disorder, social anxiety, OCD, and learning disorder. Tr. 221. He indicated he was 6' tall, weighed 160 pounds, and his conditions did not cause him pain or other symptoms. *Id.*

C.    Administrative Proceedings

Plaintiff's administrative hearing was held on August 25, 2021 in Greenville, South Carolina. Tr. 28. Plaintiff appeared with his attorney and testified. *Id.* Plaintiff's mother and VE Dawn Bergren also testified. *Id.* The hearing was conducted via teleconference. Tr. 30.

1.    Plaintiff's Testimony

In response to questions from the ALJ Plaintiff testified he was 52 years old, was 6'1" tall, weighed 200 pounds, was right-handed, had never been married or had children, and lived with

---

[2] At his administrative hearing Plaintiff testified he started but did not complete the tenth grade, but he completed the ninth grade. Tr. 36.

his mother and brother in a one-level house. Tr. 33–34. Plaintiff testified he had no source of income, and his mother and brother paid the household expenses. Tr. 34-35. Plaintiff stated that he did not have any medical insurance, but he received help on mental health medicine. Tr. 35-36. Plaintiff completed the ninth grade and never got a GED. Tr. 36. Plaintiff was held back in the eighth grade and struggles with reading comprehension and math. Tr. 48. He attended vocational rehabilitation in early 2000 but quit after a couple of weeks because of his anxiety. Tr. 36–37. Plaintiff obtained a couple of jobs through staffing agencies in 2005 and 2006 but experienced panic attacks both at work and prior to work and stopped showing up. Tr. 37–39. Plaintiff spends his days watching TV, drawing, and painting. Tr. 39–40. He also scrolls Facebook for about 10 minutes every day, just looking at the pictures. Tr. 41, 49. He tries to help his mother cook and with the laundry and tries to help cut the grass. Tr. 41–42. He sometimes goes grocery shopping but has to be with someone else and sometimes has to leave the store and sit in the car if his anxiety gets too bad. Tr. 42. He affirmed that he can take care of his own personal hygiene. Tr. 44.

Plaintiff was diagnosed with bipolar disorder in early 2000. Tr. 45. He has been attending counseling at a mental health clinic since 2003 and sees a counselor and a doctor there every two-to-three months. Tr. 40–41. He takes Zyprexa, Buspar, and Pristiq for anxiety and Trazadone to help him sleep. Tr. 41. The Zyprexa also helps with Plaintiff's bipolar disorder but he still experiences mood swings. Tr. 44–45. Plaintiff also has OCD, which he testified keeps him from being able to think about one thing at a time. Tr. 45–46. He stated that his OCD makes his mind spin and he is obsessive about certain things being in order. Tr. 46. Plaintiff testified that he has panic attacks twice a month. *Id.*

In response to questions from his attorney Plaintiff testified that he rarely leaves his house due to his anxiety and paranoia. Tr. 47. This was especially true during the pandemic, when

Plaintiff became afraid of touching things and being near other people. *Id.* At the time of the hearing, Plaintiff's doctor had recently increased his Buspar dosage because of anxiety. Tr. 48–49. Plaintiff testified the increased dose helped to "knock the edge off" his anxiety and kept him from having full-blown panic attacks all the time, but that he still experienced anxiety. Tr. 49.

2.     Plaintiff's Mother's Testimony

In response to questions from Plaintiff's attorney, the witness testified Plaintiff had lived with her all his life and she was not sure he could live by himself. Tr. 51. She stated Plaintiff would have trouble buying groceries and getting himself to the doctor and back on his own. *Id.* The witness testified Plaintiff had not been to the grocery store with her recently and that, when he did go, he could only stay in the store for about ten minutes, would not go in aisles with lots of other people, and would sometimes start to have a panic attack and need to go sit in the car. Tr. 52. She stated Plaintiff does not go anywhere and spends his day watching TV, drawing, and talking on the phone with friends. Tr. 52–53. She testified that Plaintiff sometimes wanted to be alone in his room but he spent most of his time with her. Tr. 53. Regarding Plaintiff's panic attacks, the witness testified he would get short of breath and overwhelmed and that he had even experienced them in the middle of the night. *Id.* In response to questions from the ALJ the witness stated that, prior to the pandemic, she and Plaintiff would attend church, and Plaintiff would stay for the singing and then go sit in the car and wait for her. Tr. 54–55.

3.     VE's Testimony

The ALJ noted Plaintiff had no past relevant work, and proposed the following hypothetical: an individual of Plaintiff's age and education, with the ability to understand and remember short, simple instructions but not detailed instructions; who could carry out and perform simple, routine, repetitive tasks; could respond appropriately to supervision, coworkers, and usual

work settings but would perform best in settings that did not require ongoing interaction with the public; and could be aware of normal workplace hazards and take appropriate precautions, use judgment to make simple, work-related decisions, and adjust to a very few usual changes in a routine work setting. Tr. 55–56. The VE testified the hypothetical individual could perform work as a cleaner II, Dictionary of Occupational Titles ("DOT") #919.687-014, with a medium exertion level, SVP of 1, and approximately 176,000 positions available in the national economy; floor waxer, DOT #381.687-034, with a medium exertion level, SVP of 2, and 1,219,000 positions available in the national economy; and factory helper, DOT #529.687-034, with a medium exertion level, SVP of 2, and approximately 42,000 available positions in the national economy. Tr. 57–58.

The VE testified she had not considered any limitations not specifically given by the ALJ. Tr. 59. In response to questions from Plaintiff's attorney, she stated all full-time, competitive work would be precluded if the hypothetical individual were to forget even simple instructions more than one-third of the time after five minutes, was unable to deal with occasional variables in work instructions encountered on the job, had moderately severe limitations in his ability to cope with the pressures in an ordinary work setting such that he could not meet quality and production numbers 20% of the time, or would be absent two days per month due to anxiety or panic attacks. Tr. 59–61. The VE also agreed an individual who could not handle cleaning chemicals would be precluded from the cleaner II and floor waxer positions. Tr. 61–62.

With no further questions the hearing adjourned. Tr. 62.

II.    Discussion

A.    The ALJ's Findings

In her September 24, 2021 decision, the ALJ made the following findings of fact and conclusions of law:

1.      The claimant has not engaged in substantial gainful activity since May 28, 2020, the application date (20 CFR 416.971 *et seq.*).

2.      The claimant has the following severe impairments: depressive, bipolar and related disorder, anxiety and obsessive-compulsive disorder, and learning disorder (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-[]exertional limitations: the claimant is able to understand and remember short, simple instructions but not detailed instructions; he can carry out and perform simple, routine, repetitive tasks. He can respond appropriately to supervision, co-workers, and usual work situations, but would perform best in settings that do not require ongoing interaction with the public. The claimant is able to be aware of normal workplace hazards and take appropriate precautions, use judgment to make simple work-related decisions, and adjust to very few usual changes in a routine work setting.

5.      The claimant has no past relevant work (20 CFR 416.965).

6.      The claimant was born on [REDACTED] and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education (20 CFR 416.964).

8.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since May 28, 2020, the date the application was filed (20 CFR 416.920(g)).

Tr. 12, 14, 17, 18.

    B.      Legal Framework

        1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing past relevant work ("PRW"); and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he/she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.  The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party. . . ." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*,

*Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the Commissioner's conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

Plaintiff alleges the ALJ erred by failing to include in the residual functional capacity ("RFC") a limitation related to his moderate limitation in concentration, persistence, and pace ("CPP") or to explain why such a limitation was not warranted. Pl.'s Br. 6-14, ECF No. 14.

1.   Relevant Medical Evidence

Given that the period relevant to Plaintiff's claim is only a little over one year and Plaintiff treated with his mental health providers every couple of months, the medical records are very limited. In addition, the pandemic was ongoing throughout the relevant period, forcing most of Plaintiff's appointments to take place over the phone. Plaintiff's counseling notes list his active diagnoses as bipolar II disorder, social anxiety disorder, and obsessive-compulsive disorder. Tr. 285, 300, 301, 316. He is noted to have "moderate" symptoms, including social anxiety, compulsive behaviors, and mood swings. *Id.* The treatment notes do not reveal much about Plaintiff's counseling sessions, but they indicate Plaintiff worked with his counselor to identify triggers and learn coping mechanisms so he could better manage his moods and compulsions. *Id.* Plaintiff's counselor noted Plaintiff could transition to "less intensive" service when he was able to reach these goals but that, until then, he would need to continue to draw, rely on his family, and receive medication. *Id.* Plaintiff did not meet his goals during the relevant period.

Plaintiff treated with his psychiatrist, Dr. Raymond Kimball, every three months for medication checks. Dr. Kimball consistently noted Plaintiff's concentration and attention to be intact and within normal limits. Tr. 292, 290, 288, 286, 304, 302. However, throughout the relevant period, Plaintiff reported continued mood fluctuations, periods of overwhelming anxiety, increased anxiety when out in public, OCD symptoms like excessive hand washing, and occasional panic attacks. *Id.* Dr. Kimball increased Plaintiff's dose of Zyprexa in February and again in August 2020, which Plaintiff reported "helped some" with stabilizing his mood and made him feel "reasonably stable." Tr. 286, 304, 302.

In August 2020, Plaintiff underwent a consultative examination with Dr. Rebecca L. Sorrow, PhD. Tr. 295–98. Plaintiff scored 24/30 on the Folstein Mini-Mental State Examination ("MMSE") and missed one word on recall and all the serial 7s. Tr. 296. He reported problems

sleeping because of racing thoughts and "described his mood as hyper for 3 or 4 days and then down." *Id.* He stated his memory varied from good to poor and that he had problems with memory and concentration. *Id.* Plaintiff also reported that he gets stressed when having to make decisions, he worried "all the time" about his mother and having to leave the house, and he washed his hands a lot and had to have things in order. *Id.* Dr. Sorrow noted Plaintiff did not appear to embellish his deficits or attempt to malinger. *Id.* She found Plaintiff experiences excessive anxiety, has frequent panic attacks, worries a great deal, and engages in compulsive behaviors. Tr. 297. However, Dr. Sorrow noted Plaintiff's compulsive behaviors "do not appear to take up an inordinate amount of time or significantly interfere with his functioning." *Id.* Dr. Sorrow concluded Plaintiff's performance on the MMSE, functional assessment, and behavior during the examination indicated he was "probably capable of the concentration and focus needed to perform simple tasks and follow simple instructions." Tr. 298. However, she also found Plaintiff's anxiety, panic attacks, and hypomanic and depressive episodes were likely to interfere with his ability to follow complex commands or make complicated decisions and his symptoms were likely to interfere with his ability to adapt to change and to tolerate stress in a work situation. *Id.* Dr. Sorrow's report did not reference any specific functional limitations.

The state agency psychologists at both levels of review found Plaintiff had severe mental impairments and moderate limitations in all four paragraph B categories. Tr. 92–95, 105–10. On initial review, Dr. Rebekah Jackson noted Plaintiff had difficulty with understanding, following instructions, memory and concentration and could pay attention for 30 minutes. Tr. 93. She found Plaintiff's statements to be "largely consistent." *Id.* Dr. Jackson concluded that, while Plaintiff's mental impairments were severe, they were not so severe as to preclude him from performing simple, unskilled tasks with limited general public contact. *Id.* In support of her opinion, Dr.

Jackson pointed to Plaintiff's intact attention, memory, and concentration at his most recent appointment; performance on the MMSE; Dr. Sorrow's opinion that Plaintiff was capable of simple tasks; and her own conclusion that Plaintiff was capable of performing activities of daily living ("ADLs") but relied on family. *Id.* In assessing Plaintiff's mental RFC, Dr. Jackson considered Plaintiff's understanding and memory and sustained concentration and persistence limitations separately but offered the same opinion regarding both—that Plaintiff could understand and remember simple, but not detailed instructions. Tr. 94–95. On reconsideration, Dr. Larry Clanton considered the treatment notes from Plaintiff's most recent med check and agreed with Dr. Jackson's prior assessment. Tr. 106, 108–11.

2.     Discussion

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1. "RFC is not the *least* an individual can do despite his or her limitations, but the *most*." *Id.* (emphasis in original). At the administrative hearing level, the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 416.946. An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 416.945(a)(3), (4). Social Security Ruling 96-8p requires the RFC assessment to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. The ALJ must discuss the claimant's ability to "perform sustained work activities in an ordinary work setting" on a regular work schedule. *Id.* Further, "[t]he RFC assessment must include a discussion of why reported

symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

Here, the ALJ found Plaintiff could (1) understand and remember short, simple instructions but not detailed instructions; (2) carry out and perform simple, routine, repetitive tasks; (3) respond appropriately to supervision, co-workers, and usual work situations but would perform best in settings that do not require ongoing interaction with the public; (4) be aware of normal workplace hazards and take appropriate precautions, use judgment to make simple, work-related decisions, and adjust to very few changes in a routine work setting. Tr. 14. The ALJ explained that the limitation to simple, routine, repetitive tasks accounted for Plaintiff's moderate CPP limitation. Tr. 16.

Plaintiff argues an RFC that limits a claimant to short, simple instructions and simple, routine, repetitive work does not account for a claimant's time off-task or limitations in CPP. ECF No. 14 at 7–12. The court agrees.

In *Mascio*, the Fourth Circuit agreed with other circuits that an "ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (joining the Third, Seventh, and Eighth Circuits)). The court determined that "the ability to perform simple tasks differs from the ability to stay on task. Only the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* However, in *Shinaberry v. Saul*, the Fourth Circuit clarified that *Mascio* "[does] not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." 952 F.3d 113, 121 (4th Cir. 2020). There, the court upheld the ALJ's RFC

assessment because "the ALJ's findings and the mental limitation included in the RFC [were] sufficiently explained and supported by substantial evidence in the record." *Id.* at 121–22.

The Commissioner argues this case is distinguishable from *Mascio* and akin to *Shinaberry* because, here, the ALJ "did not simply limit Plaintiff to simple (or unskilled), routine work" but "incorporated extensive mental restrictions," provided a "robust explanation for her RFC assessment," and supported her findings with a careful review of the state expert and consultative examiner reports. ECF No. 16 at 11–15.

While Plaintiff's RFC does include additional mental restrictions, not one relates to his time off-task.[4] Thus, the ALJ was required to explain why she found additional RFC limitations related to Plaintiff's moderate CPP limitations were not supported by the evidence. *See Mascio*, 780 F.3d at 638 (an "ALJ can explain why [a claimant's] moderate limitations in concentration, persistence, or pace at step three does not translate into a limitation" in the claimant's RFC); *Shinaberry*, 952 F.3d at 121–22 (upholding ALJ's decision where ALJ "discussed in detail the

---

[4] The Paragraph B criteria for maintaining concentration, persistence, and pace provides specific examples of a claimant's ability "to focus attention on work activities and stay on task at a sustained rate." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(E)(3). The examples include:

Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

*Id.* Thus, courts have found that limitations related to a plaintiff's ability to stay on task include limiting the length of time that the claimant can concentrate, persist, and work at pace to two hours in an eight-hour day, *Shepard v. Comm'r of Soc. Sec.*, C/A No. 5:20-4206-KDW, 2022 WL 807157, at *10 (D.S.C. Mar. 17, 2022) (collecting cases), or precluding high-quota production-rate jobs, *see, e.g.*, *Charles M. v. Kijakazi*, C/A No. 22-2370-BAH, 2023 WL 3645654, at *3 (D. Md. May 25, 2023) (affirming where RFC included limitation to work in two-hour increments and precluded strict production quotas). Here, there was no discussion at the hearing or in the ALJ's decision about whether Plaintiff's limitations could be accommodated by regular breaks throughout the workday.

psychological evaluations performed by the SSA psychological consultants and [consultative examiner], as well as Shinaberry's adult function report, and sufficiently explained why the mental limitation to simple, routine, repetitive tasks accounted for Shinaberry's borderline intellectual disability and her moderate limitations in her concentration, persistence or pace").

At step three, after finding Plaintiff's mental impairments severe, the ALJ considered whether those impairments met or medically equaled the paragraph B criteria of Listings 12.04, 12.06, and 12.11.[5] Tr. 12–14. Regarding CPP, the ALJ found Plaintiff had a moderate limitation, reasoning:

> The claimant has alleged that he has difficulty maintaining attention and concentration for longer than 10 to 20 minutes. However, routine mental status exams report intact attention and concentration. Nevertheless, despite any difficulties, the claimant remained able to perform a variety of simple tasks, such as housekeeping, managing his own finances, using a tablet to access the internet, making his own appointments, and attending to his own grooming and personal hygiene.

Tr. 13 (citations omitted).

The ALJ proceeded to the next step of determining and explaining Plaintiff's RFC. The ALJ considered Plaintiff's allegation that his impairments impacted his ability to concentrate but reiterated that Plaintiff's impairments caused "no more that moderate limitations in the four paragraph B criteria." Tr. 15. She further found Plaintiff's alleged severity of his symptoms

---

[5] The listings for mental disorders are arranged in 11 categories: Neurocognitive disorders (12.02); schizophrenia spectrum and other psychotic disorders (12.03); depressive, bipolar and related disorders (12.04); intellectual disorder (12.05); anxiety and obsessive-compulsive disorders (12.06); somatic symptom and related disorders (12.07); personality and impulse-control disorders (12.08); autism spectrum disorder (12.10); neurodevelopmental disorders (12.11); eating disorders (12.13); and trauma- and stressor-related disorders (12.15). Paragraph B of each listing (except 12.05) provides the functional criteria to be assessed, in conjunction with a rating scale (see 12.00E and 12.00F), to evaluate how a claimant's mental disorder limits functioning. These criteria represent the areas of mental functioning a person uses in a work setting. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Section 12.00(A)(1) and (2)(b).

inconsistent with the longitudinal record of mostly normal mental status examination findings. Tr. 16. The ALJ observed that, although Plaintiff reported problems with memory, attention, and concentration during his consultative exam, he reported normal energy and concentration to his providers. *Id.* She further considered Plaintiff's reported ADLs and that Plaintiff "only experiences approximately two panic attacks per month" and "has not sought medical treatment with the frequency that could reasonably be expected from an individual who is suffering from symptoms of the intense and disabling nature" of those alleged by Plaintiff. *Id.* The ALJ also found persuasive the state agency psychologists' opinions and Dr. Sorrow's opinion, noting that all three were consistent with the treatment notes indicating Plaintiff was "reasonably stable when compliant with prescribed medication, other than some anxiety and OCD symptoms." Tr. 16–17.

Nowhere in this explanation does the ALJ address Plaintiff's ability to stay on task. In fact, rather than explaining why additional CPP limitations were not supported, the ALJ explicitly found that Plaintiff's "moderate limitation in concentration, persistence, and pace supports the residual functional capacity's limitation to carrying out and performing simple, routine, repetitive tasks." Tr. 16.

Although Plaintiff's mental status examinations were mostly normal, he continued to report symptoms related to his mental impairments, including compulsive thoughts, excessive anxiety, and unpredictable mood fluctuations, despite spending almost all his time at home, where he was comfortable and had some control over his environment. Plaintiff's reports of ongoing symptoms are supported by his continued work with his counselor on recognizing triggers and learning coping mechanisms and with his psychiatrist on finding the right combination and dose of medications. Plaintiff indicated in his adult function report and to Dr. Sorrow that his symptoms included racing thoughts, especially around strangers and when under stress, and trouble focusing

if things were out of order. Racing and compulsive thoughts would undoubtedly impact a person's ability to concentrate and stay on-task. Furthermore, Dr. Sorrow concluded Plaintiff's symptoms were likely to interfere with his ability to tolerate stress in a work situation. According to the VE, if Plaintiff's symptoms kept him from meeting quality or production requirements 20% of the time or made him absent from work two days per month,[6] Plaintiff would be precluded from all work.

In sum, while the ALJ in this case included more explanation than the ALJ in *Mascio*, she failed to reconcile important inconsistencies in a way that would permit meaningful judicial review and the court is constrained to remand this case for further consideration. *Mascio*, 780 F.3d at 636 ("Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.").

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine if the Commissioner's decision is supported by substantial evidence. The court hereby reverses the decision of the Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g) and remands the matter to the Commissioner for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

June 21, 2023                                             Kaymani D. West
Florence, South Carolina                      United States Magistrate Judge

---

[6] The ALJ apparently does not discount Plaintiff's allegation that he continues to experience two panic attacks per month but fails to explain why his panic attacks would not cause Plaintiff to miss work, as he testified they had in the past.